IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LINCOLN BENEFIT LIFE, | ) | 4:13CV3210 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| JAMES W. WILSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

    Plaintiff, Lincoln Benefit Life ("LBL"), is a life insurance company. Defendant, James W. Wilson, is an insurance broker. LBL sues Wilson to recover approximately $15 million in damages, claiming a right to indemnity or contribution at common law (count I), breach of contract (count II), and negligence (count III). LBL also seeks to obtain a declaratory judgment that no additional commissions are owed to Wilson (count IV). Wilson counterclaims to recover approximately $2.7 million in damages, alleging a single claim for breach of contract for nonpayment of commissions.

    In 1999, Wilson was retained by shareholders of Lollytogs, Inc., to procure insurance on the life of one of the company's co-founders, Samuel Gindi, in order to fund a buyout of Gindi's interest in Lollytogs upon his death. The shareholders wanted to replace an existing policy that had been issued by a company other than LBL. Wilson entered into a special agent's agreement with LBL, which then issued two term policies with 10-year level premium periods. After 10 years the premiums would escalate, but the term policies allowed for conversion to permanent insurance "[p]rior to the earlier of the policy anniversary next following the insured's seventieth birthday or the end of this level premium period." Gindi was 75 years old when the term policies were issued.

In 2000, the shareholders questioned Wilson about the convertibility of the term policies, and he in turn questioned LBL. A faxed response from LBL indicated that "[t]his policy will have conversion privileges up to the term of the policy." In 2003, after Wilson again contacted LBL to inquire about the policies' conversion rights, LBL took the position that the policies were not convertible due to Gindi's advanced age.  However, because of the "misinformation" that was provided in the 2000 fax, LBL offered to convert the policies within 30 days. LBL subsequently issued five universal life insurance policies for a "free look" period, but they were not accepted by the Lollytogs shareholders. LBL then reinstated the two term polices.

In 2007, the Lollytogs shareholders notified LBL that they intended to convert the two term policies before the end of their 10-year level premium periods in 2009. LBL responded that although an exception had been granted in 2003, "these policies no longer have a conversion privilege due to the age of the insured."

In 2009, the Lollytogs shareholders filed suit for breach of contract against LBL in the United States District Court for the Southern District of New York. Annual premiums were ordered paid into escrow while the case was pending. Gindi died in 2012. In 2013, after the jury returned a verdict in favor of the Lollytogs shareholders, the court entered a judgment that required LBL to pay a death benefit of $29 million (the total amount of two the term policies) and that directed the escrow agent to pay LBL approximately $7.3 million for premiums due during 2009-2012.

LBL now seeks to collect from Wilson the difference between the $7.3 million premium amount that was determined by the jury and the amount it otherwise would have received as premium payments under the two term policies. Wilson meanwhile seeks to collect from LBL the amount of additional commissions he would have earned if LBL had allowed conversion of the term policies in 2009.

LBL and Wilson have filed cross-motions for summary judgment on each other's claims. Wilson also seeks summary judgment on his claim, with the amount

of damages to be determined later.  LBL has not moved for summary judgment on its claims for money damages and declaratory relief. Because a complete record of the New York litigation is not in evidence, and because the potentially case-dispositive question of collateral estoppel (or issue preclusion) has not been adequately briefed, the court will defer ruling on the pending motions and will postpone trial in order to permit supplementation of the record and additional briefing.

## I. DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, Anderson, 477 U.S. at 249.  However, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. at 256.

"A mere scintilla of evidence is insufficient to defeat summary judgment and if a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." Brunsting v. Lutsen Mountains Corp., 601 F.3d 813, 820 (8th Cir. 2010) (internal quotation marks and citations omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Ricci v. DeStefano, 557 U.S. 557, 586 (2009)).

### A. LBL's Claims

In support of his motion for summary judgment, Wilson argues: (1) LBL's claims for breach of contract and negligence fail as a matter of law because (a) the duties he allegedly breached were owed to the Lollytogs shareholders, not LBL, and (b) the jury's verdict in the New York litigation conclusively establishes that LBL's injury resulted solely from its own actions, and not because of any prior breach of the special agent's agreement or negligence on his part; and (2) LBL's claim for contribution or indemnity fails as a matter of law because of "the doctrine of acquiescence." Responding to the first argument, LBL argues: (1) Wilson's reliance upon the doctrine of res judicata is misplaced; (2) proximate cause is a question of fact to be determined by the jury; and (3) LBL's conduct was not an intervening cause. In reply, Wilson argues that collateral estoppel applies even if res judicata does not. With respect to Wilson's second argument, LBL contends it only attempted to rectify a bad situation created by Wilson.

### 1. Breach of Contract or Negligence

In September 1999, LBL appointed Wilson to sell insurance products pursuant to a "Special Agent's Agreement – Appointment" (Filing No 102 (LBL's statement of material facts), ¶ 12; Filing No. 103-4). The appointment was made at Wilson's request, in connection with his shopping for life insurance for Samuel Gindi (Filing No. 102, ¶ 12; Filing No. 105 (Wilson's statement of material facts), ¶ 6). The special agent's agreement generally provided that Wilson was to "solicit applications for the policies of insurance and annuity contracts written by LBL" and to "submit such applications received to LBL" (Filing No. 102, ¶ 14; Filing No. 103-4, at CM/ECF p. 3). LBL contends Wilson breached the following provisions of the special agent's agreement:

> In addition to the requirement that you comply with the rules and
> regulations of LBL pertaining to underwriting practices, acceptance of

risks, delivery of policies, and all other areas of LBL's business, you are required to:

(1)     Comply with LBL's policies and procedures concerning the replacement of life insurance policies and annuity policies. A replacement occurs whenever an existing life insurance policy or annuity is terminated, converted, or otherwise changed in value. For any transaction involving a replacement, LBL requires you to:

      (a)     recommend the replacement of an existing policy only when replacement is in the best interest of the customer;

      * * *

(2)     Adhere to LBL's rules and regulations concerning ethical market conduct, which require that you:

      (a)     carefully evaluate the insurance needs and financial objectives of your clients, and use sales tools (*e.g.*, policy illustrations and sales brochures) to determine that the insurance or annuity you are proposing meets these needs;

      * * *

Limitation of Authority – You shall not exercise any authority on behalf of LBL other than expressly conferred by this Agreement. Specifically, but not in limitation of the foregoing, you shall have no authority on behalf of LBL to:

      (1)     Make, alter, or discharge any contract.

      * * *

      (4)     Waive or modify any terms, conditions, or limitations of any policy.

(Filing No. 103-4, at CM/ECF pp. 3-4).

LBL alleges that "Wilson's conduct in procuring the policies constituted a breach of the contract with Lincoln Benefit because Wilson did not 'carefully evaluate the insurance needs and financial objectives of [Lollytogs],' and improperly 'determine[d] that the [proposed] insurance ... [met] these needs'" (Filing No. 1-3 (complaint), ¶ 60)[1] and "because Wilson recommended replacement of an existing policy with the Lincoln Benefit policies when it was not 'in the best interest of the customer'" (Filing No. 1-3, ¶ 62).[2] Similarly, it is alleged that "Wilson acted negligently in failing to evaluate the needs and financial objectives of Gindi" (Filing No. 1-3, ¶ 67). LBL also alleges that Wilson acted negligently "in failing to properly review the terms of the life insurance products he sold" (Filing No. 1-3). Finally, LBL alleges that "Wilson 'modif[ied] terms, conditions, or limitations of [the] polic[ies]'" by his "assurances and representations to Gindi and/or Sutton[3] regarding the conversion rights available" (Filing No. 1-3, ¶¶ 64, 65) and "acted negligently in misrepresenting and/or failing to clarify the rights and obligations of Lincoln Benefit, Gindi, and/or Lollytogs both prior to and after the issuance of the policies" (Filing No. 1-3, ¶ 69).

As an initial matter, Wilson argues that "each of the alleged violations, whether based upon a contractual agreement or common law, focus on what Wilson should have done vis a vis his client's, Lollytogs, insurance needs and objectives," and that "[n]owhere is it articulated as to the harm or damage to [LBL]" (Filing No. 101, at CM/ECF p. 22). LBL has not responded to this argument except to state (in a

_____

[1] More specifically, LBL alleges that "[h]ad Wilson 'carefully evaluate[d] the insurance needs and financial objectives of [Gindi],' and properly 'determine[d] that the [proposed] insurance . . . [met] these needs,' Wilson would not have sold the policies to Lollytogs because Gindi's age at the time of issuance rendered the policies ineligible for conversion"(Filing No. 1-3, ¶ 61).

[2] LBL alleges that "[t]he absence of Gindi's ability to exercise conversion rights based on his age at the time of the policies' issuance was not in the 'best interest' of Gindi or Lollytogs" (Filing No. 1-3, ¶ 63).

[3] Richard Sutton was Lollytogs' CEO.

footnote) that LBL's complaint "clearly avers that '[a]s a result of Wilson's conduct, Lincoln Benefit has incurred damages in excess of $15 million because it has not received premium commensurate with the risk it covered'" (Filing No. 119, at CM/ECF p. 15). The risk LBL covered, as conclusively determined in the New York litigation, was insuring the life of a 75-year-old man for a 10-year level premium period and granting him the right to convert the term policies to permanent insurance before the expiration of such 10-year period, which was precisely the coverage the Lollytogs shareholders expected to receive.[4]

It is further alleged, however, that Wilson exceeded his authority and breached the special agent's agreement by modifying the terms, conditions, or limitations of the life insurance policies he sold to the Lollytogs shareholders. "It is the duty of an agent of limited authority to adhere faithfully to the instructions of his principal, and if he exceeds, violates, or neglects them, and loss results to his principal as a natural and ordinary consequence, he is liable therefor." *League v. Vanice*, 374 N.W.2d 849, 857 (Neb. 1985) (quoting *Winchell v. National Bank of Commerce Trust & Sav. Assn.*, 152 N.W.2d 2, 5 (Neb. 1967).[5] Whether this claim sounds in contract or tort need not be decided at this time.[6] Nor is it necessary to decide now whether Wilson's alleged

---

[4] Although the parties disagree about the meaning and significance of the jury's findings, there is no genuine dispute that, in the words of the presiding judge, "[t]he jury handed [the Lollytogs shareholders] a resounding victory" (Filing No. 113-1, at CM/ECF p. 4).

[5] The special agent's agreement provides that it "shall be governed by and construed according to the laws of the State of Nebraska" (Filing No. 103-4, at CM/ECF p. 4). The parties are in agreement that Nebraska substantive law applies in this action.

[6] In *Lesiak v. Central Valley Ag Co-op., Inc.*, 808 N.W.2d 67, 83 (Neb. 2012), the Nebraska Supreme Court announced the following qualification to the judicially created economic loss doctrine:

> Generally speaking, the doctrine limits a party's ability to recover for economic losses (or commercial losses), unaccompanied by personal

failure to review the policy language and to clarify coverage is actionable negligence, since Wilson's only other contention is that the New York litigation precludes LBL from claiming that its injury resulted from Wilson's alleged acts or omissions.

### 2. Res Judicata or Collateral Estoppel

In support of his motion for partial summary judgment, Wilson advances this central argument:

> Lincoln Benefit's claims against Defendant all stem from allegations that Defendant failed to properly ascertain the terms and conditions contained in the term policies that were sold to Lollytogs. Specifically, it is alleged that there was no basis for Defendant to conclude that the term policies sold to Lollytogs were eligible for conversion because the individual whose life was being insured, Samuel Gindi, was over the age of 70. Putting aside the fact that Defendant was at all times under the belief that Plaintiff, because of its desire to collect premiums for the two life insurance policies totaling $29 million, had waived any age limitation with respect to conversion, there came a time, after the polices were initially delivered, that Defendant, following Plaintiff's own procedure, sought clarification from Plaintiff as to whether the term policies in fact had conversion rights. In a fax dated July 13, 2000, that became the critical piece of evidence in the Prior Action and which serves as Plaintiff's death knell herein, Lincoln Benefit wrote back to Defendant and informed him, per Lincoln Benefit's Vice President of Customer Service, Mr. Stan Shelly, that the term policies in fact were convertible. Because the jury in the Prior Action concluded that this fax, amongst other conduct engaged in by Plaintiff, estopped Lincoln Benefit from denying that the Subject Policies had conversion rights, Plaintiff herein cannot establish any proximate cause to the alleged breaches it claims stemmed from Defendant's conduct – conduct all taking place prior to

---

injury or damage to other property, allowing recovery only under contract law. But we expressly restrict the doctrine's application to where economic losses are (1) caused by a defective product or (2) caused by an alleged breach of a contractual duty, where no tort duty exists independent of the contract itself.

Plaintiff's fax to Defendant declaring what the Policyholder's rights were with respect to the Subject Policies.

(Filing No. 101, at CM/ECF pp. 8-9).

LBL counters that "[t]he underlying action, in which Wilson was not even a party, is not dispositive of Lincoln Benefit's rights against Wilson, nor does the underlying action somehow bar Lincoln Benefit from pursuing Wilson for the damages it has incurred as a result of Wilson's misconduct" (Filing No. 119, at CM/ECF p. 7). In support of its claims, LBL contends "[t]he facts demonstrate that Wilson – not Lincoln Benefit – caused the harm here because Wilson misinformed the policyholders concerning the features of the subject policies" and "Lincoln Benefit's subsequent conduct, which was indisputably precipitated by Wilson, does not somehow absolve Wilson of liability for the misinformation and confusion that he originally caused" (Filing No. 119, at CM/ECF p. 7). LBL denies that it is "seeking to relitigate the conversion rights available under the Policies," but generally argues that "[t]o the extent Wilson seeks to characterize Lincoln Benefit's conduct as a superseding or intervening cause of the damages incurred by Lincoln Benefit, this necessarily involves the application of law to fact, which is left to the factfinder" (Filing No. 119, at CM/ECF pp. 17-18).

Wilson argues that LBL's damage claim is barred by the doctrine of res judicata (claim preclusion). LBL responds that the doctrine is inapplicable because Wilson was not a party to the New York litigation or in privity with the plaintiff in that action. Without conceding the point, Wilson replies with an alternative argument that collateral estoppel (issue preclusion) applies.[7] Both parties wrongly assume that Nebraska law will determine the preclusive effect of the New York litigation.

---

[7] In his answer, Wilson alleges both res judicata and collateral estoppel as affirmative defenses (Filing No. 17, ¶¶ 86-94).

"In a diversity case like this, [the Eighth Circuit] appl[ies] state substantive law in deciding whether to apply collateral estoppel or issue preclusion, *see Austin v. Super Valu Stores, Inc.*, 31 F.3d 615, 617 (8th Cir.1994), 'giving a ... judgment preclusive effect if a court in that state would do so,' *In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999)." *Ideker v. PPG Industries, Inc.*, __ F.3d __, 2015 WL 3621382, *2 (8th Cir. June 11, 2015). "This rule applies even when the original judgment is that of another federal court sitting in diversity." *Id.* (quoting *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir. 2003). The same is true with respect to res judicata or claim preclusion. *See Austin*, 31 F.3d, at 617-18.

"[A] federal court exercising diversity jurisdiction in forum II [is required] to give to the judgment of a federal court exercising diversity jurisdiction in forum I the same full faith and credit that a state court in forum II would be obliged to give the judgment of a state court in forum I, at least in the absence of an overriding federal interest." *Id.*, at 618 (quoting *Semler v. Psychiatric Institute of Washington, D.C., Inc.*, 575 F.2d 922, 927 (D.C. Cir. 1978)). That is to say, "[t]he 'res judicata [or collateral estoppel] effect of the first forum's judgment is governed by first forum's law," in this case [New York] law." *St. Paul Fire and Marine Ins. Co. v. Compaq Computer Corp.*, 457 F.3d 766, 770 (8th Cir. 2006) (quoting *Austin*, 31 F.3d, at 618); *see also Hillary v. Trans World Airlines, Inc.*, 123 F.3d 1041, 1043 (8th Cir. 1997) (applying state law while noting that "the majority of circuits have held that the res judicata effect of a federal court judgment in a diversity action is a matter of federal law").

"In New York, res judicata, or claim preclusion, bars successive litigation based upon the same transaction or series of connected transactions if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action [or proceeding], or in privity with a party who was." *Starla D. v. Jeremy E.*, 994 N.Y.S.2d 702, 703 (N.Y.A.D. 3 Dept. 2014) (quoting *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 894 N.E.2d 1, 12 (N.Y. 2008)). "Similarly, collateral estoppel, or issue preclusion, 'precludes a party from relitigating in a subsequent action or proceeding an issue

-10-

raised in a prior action or proceeding and decided against that party or those in privity.'" *MLCFC 2007-9 ACR Master SPE, LLC v. Camp Waubeeka, LLC*, 999 N.Y.S.2d 202, 206 (N.Y.A.D. 3 Dept. 2014) (quoting *Weston v. Cornell Univ.*, 983 N.Y.S.2d 353, 355 (N.Y.A.D. 3 Dept. 2014)).

"Res judicata applies only to previous litigation between the same parties or others in privity." *Spano v. Novello*, 788 N.Y.S.2d 205, 209 (N.Y.A.D. 3 Dept. 2004). "[P]ersons in privity include those whose interests are represented by a party to the previous action and those '[whose] own rights or obligations in the subsequent proceeding are conditioned in one way or another on, or derivative of, the rights of the party to the prior litigation.'" *Bayer v. City of New York*, 983 N.Y.S.2d 61, 63 (N.Y.A.D. 2 Dept. 2014) (quoting *D'Arata v. New York Cent. Mut. Fire Ins. Co.*, 564 N.E.2d 634, 637 (N.Y. 1990)). "Generally, to establish privity the connection between the parties must be such that the interests of the nonparty can be said to have been represented in the prior proceeding." *Lynch v. National Prescription Adm'rs, Inc.*, __ F.3d __, 2015 WL 3395937, *3 (8th Cir. May 27, 2015) (applying New York law and quoting *Green v. Santa Fe Indus., Inc.,* 514 N.E.2d 105, 108 (N.Y. 1987)). The doctrine of res judicata is inapplicable in this case, where Wilson's potential liability to LBL actually stems from the prior litigation in which the Lollytogs shareholders prevailed on their breach of claim against LBL. In other words, Wilson is not in privity with the shareholders.

Such lack of privity does not prevent Wilson from relying on the collateral estoppel doctrine, but he must establish that "the identical issue was necessarily decided in the prior action and is determinative in the present action." *JBGR, LLC v. Chicago Title Ins. Co.*, __ N.Y.S.3d __, 2015 WL 2388360, *2 (N.Y.A.D. 2 Dept. May 20, 2015). "The determination of an issue of law or fact will not be given preclusive effect unless 'the issue [was] material to the first action or proceeding and essential to the decision rendered therein.'" *Gadani v. DeBrino Caulking Associates, Inc.*, 926 N.Y.S.2d 724, 727 (N.Y.A.D. 3 Dept. 2011) (quoting *Ryan v. New York Tel. Co.*, 467 N.E.2d 487, 490 (N.Y. 1984)). "Whether collateral estoppel applies presents

-11-

a question of law turning on both an identity of issue and a full and fair opportunity to litigate that issue in the prior proceeding." *Hoopes v. Bruno*, 513 N.Y.S.2d 301, 302 (N.Y.A.D. 3 Dept. 1987); *Claim of Guimarales*, 503 N.E.2d 113, 115 (N.Y. 1986).

"The party asserting collateral estoppel has the burden of establishing 'identity of the issue, while the opponent must demonstrate the absence of a full and fair opportunity to litigate.'" *Gadani*, 926 N.Y.S.2d at 727 (quoting *Jeffreys v. Griffin*, 801 N.E.2d 404 (N.Y. 2003)). "In considering whether the opponent of collateral estoppel had a full and fair opportunity to litigate an issue, [the court] must consider 'the realities of the [prior] litigation, including the context and other circumstances which ... may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against' it." *Id.* (quoting *Ryan*, 467 N.E.2d at 491).

"The normal way to invoke the estoppel of a prior adjudication is to produce the judgment and the pleading on which it was based. 'It is, of course, the judgment which is the bar.'" *Bronxville Palmer, Limited v. State*, 223 N.E.2d 887, 889 (N.Y. 1966) (quoting *Ripley v. Storer*, 132 N.E.2d 87, 90 (N.Y. 1956)). "It is 'a final judgment upon the merits which is competent as evidence and conclusive in a subsequent action between the same parties or their privies.'" *Id.* (quoting *Rudd v. Cornell*, 63 N.E. 823, 828 (N.Y. 1902)). However, "where the judgment and the pleadings do not conclusively show that what was adjudicated embraces the new litigation, it may be necessary to look beyond the judgment roll, at the testimony, the charge to the jury and the record of contentions made and determined." *Id.* "Although ... the judgment roll is conclusive evidence, the charge to the jury is competent 'to show the precise issues therein decided.'" *Id.*

"If the issue previously tried can be determined from the record alone without extrinsic evidence it is a question of law for the court. When it is necessary to show the matter tried and determined in the prior action by extrinsic evidence, it becomes a question of fact for the jury. If the record is silent or ambiguous as to the points at

issue and determined by the judgment, parol evidence is competent to identify same and necessary to insure the effect of the judgment as an estoppel." *Berkowitz v. Equitable Life Assur. Soc. of U.S.*, 21 N.Y.S.2d 206, 208 (N.Y. Sup. 1940).

The evidence shows that the Lollytogs shareholders alleged in their action against LBL that "[p]ursuant to the terms of the [two term life insurance] policies, upon reaching the age of seventy or the end of the level premium period whichever is earlier, the owner of the policy is permitted to convert the subject policies from a Term Life Policy into a Flexible Premium Adjustable Life Plan or a Whole Life Plan then sold by [LBL]"; that "[n]otwithstanding the language contained in the subject policies, these policies were tendered to Gindi when he was seventy-five years old, effectively making it a contractual impossibility for him to exercise these conversion rights at the age of seventy as set forth under the terms of the contracts"; that "[LBL] was fully aware of Gindi's age at the time when the subject policies were negotiated, agreed to and issued"; that "[n]otwithstanding the fact that Gindi was over seventy years of age at the time when the policies were issued, on or about July 13, 2000, [LBL] sent a written communication ... confirming the right of conversion during the level premium period"; that "[o]n or about February 26, 2003, [LBL] acknowledged these representations in a written communication but sought to change the terms and conditions contained in the policies by only honoring the right of conversion if exercised within the next thirty days from the date of the letter"; and that the Lollytogs shareholders "refused to accept any such modification of the conversion rights set forth within the subject policies ..." (Filing No. 107-2 (amended complaint filed in *Stephen Carb as Trustee of Lollytogs, Inc. Trust v. Lincoln Benefit Life Company, Inc.*, Case No. 09cv2980, in the United States District Court for the Southern District of New York), ¶¶ 38, 41-45). As to each the term life insurance policies, the shareholders asserted claims for (1) a declaratory judgment requiring LBL to allow conversion of the policy effective as of 2009, (2) breach of contract based on LBL's failure to convert the policy in 2009, and (3) reformation of the policy to provide a right of conversion (Filing No. 107-2). The declaratory judgment claims were ordered

dismissed prior to trial as being subsumed within the breach of contract claims (Filing No. 113-2, at CM/ECF pp. 3-5).

A complete copy of the final jury instructions is not in evidence,[8] but an unsigned verdict sheet shows that the jury made the following specific "Findings Regarding the Term Policies":

1.   Did Plaintiff prove by a preponderance of the evidence that the Plaintiff had the right to convert the Term Policies to whole or universal life policies at the time the Term Conversions were sold in 1999?

      YES  ___✓___          NO  _____

2.   Did Plaintiff prove by a preponderance of the evidence that the July 13, 2000 Fax modified the subject Term Policies and  gave Plaintiff the right to convert the Term Policies to whole or universal life insurance policies through the end of the level premium periods?

      YES  ___✓___          NO  _____

3.   Based upon the law of estoppel as I have charged you, is Defendant estopped from denying that these policies have conversion rights based upon its conduct?

      YES  ___✓___          NO  _____

4.   Based upon the law of waiver as I have charged you, did Defendant relinquish any right it had to deny Plaintiff the right to convert the policies?

      YES  ___✓___          NO  _____

---

[8] In replying, Wilson has filed a portion of the trial transcript recording part of a final jury instruction conference (Filing No. 130-1).

5.      Did Defendant prove by a preponderance of the evidence that Plaintiff accepted Defendant's one time, limited offer to convert the subject Term Policies to whole or universal life policies by the February 26, 2003 letter?

YES _____      NO \_\_✓\_\_

6.      Write in the amount due to Lincoln in unpaid premiums:

$\_\_7,309,370\_\_\_

7.      Did Plaintiff prove by a preponderance of the evidence that Defendant breached the contract by failing to pay the Death Benefit ($29 million)?

YES \_\_✓\_\_      NO _____

(Filing No. 108-4).[9]

---

[9] LBL does not challenge the authenticity of the verdict sheet, but argues in its reply brief that the jury's findings are inadmissible hearsay. The findings are not hearsay because they are not offered to prove the truth of the matter asserted; rather, they are offered to prove what was decided in the case. *See* Fed. R. Evid. 801(c)(2). If it is determined that collateral estoppel applies, the result of the prior litigation will be admissible in evidence at trial. *See* 2 *McCormick on Evidence* § 298 (7th ed.) ("Where the doctrines of res judicata, collateral estoppel, or claim or issue preclusion make the determinations in the first case binding in the second, a judgment in the first case is not only admissible in the second, but it is conclusive against the party as a matter of substantive law."); *CompuCom Systems, Inc. v. Getronics Finance Holdings B.V.,* Civ. No. 09-173-SLR, 2012 WL 5845619, *1 (D.Del. 2012) ("Under Delaware law, prior findings and judgments generally either come in under collateral estoppel, as conclusive proof, or they do not come in at all, as hearsay.") (internal quotes and citations omitted). "[I]f the doctrine of collateral estoppel precludes consideration of a factual issue, that issue is not a fact to be determin[ed] at trial and, thus, the rules of evidence do not apply to that issue." *Mugno v. Casale*, Nos. CIV.A. 96-6228, CIV.A. 96-6229, 1997 WL 152793, *6 (E.D.Pa. Mar. 28, 1997). *Cf.* 18 Wright and Miller, *Federal Practice & Procedure* § 4416 (2d ed.) ("[I]t has long been settled that preclusion ordinarily is an all-or-nothing thing. The prior determination either

On April 22, 2013, United States District Judge Andrew L. Carter entered a "Final Order After Trial By Jury," stating that the jury had returned a verdict as follows:

1. THE JURY FOUND, that Plaintiff G INVESTORS HOLDING LLC ("G Investors")[10] had a right to convert the Term Policies to whole or universal life policies at the time the Term Policies were sold in l999;

2. THE JURY FURTHER FOUND, that the July 13, 2000 Fax modified the subject Term Policies and gave G Investors the right to convert the Term Policies to whole or universal life insurance policies through the end of the level premium periods;

3. THE JURY FURTHER FOUND, that Defendant LINCOLN BENEFIT LIFE COMPANY, INC. ("Lincoln") is estopped from denying that these policies have conversion rights based upon its conduct;

4. THE JURY FURTHER FOUND, that Lincoln relinquished any right it had to deny Plaintiff the right to convert the policies;

5. THE JURY FURTHER FOUND, that G Investors did not accept Lincoln's one time, limited offer to convert the subject Term Policies to whole or universal life policies by the February 26, 2003 letter;

6. THE JURY FURTHER FOUND, that Lincoln breached its contract with G Investors to pay the Death Benefit[.]

(Filing No. 113-6). Judge Carter found that the $29 million death benefit was due and owing to the plaintiff, and he directed the clerk of the court to enter a judgment in

_____

precludes any further dispute about the matter, or it is irrelevant and cannot be admitted even as some evidence bearing on the matter.") (footnotes omitted).

[10] It appears G Investors was the successor in interest to Lollytogs, Inc. Trust, and was substituted for the trustee as plaintiff sometime before trial.

favor of the plaintiff for such amount, plus interest; he also ordered that the judgment provide for the release of $7,309,370 from the escrow account for premium payments to LBL (Filing No. 113-6). Judgment was entered on April 30, 2013 (Filing No. 108-6). There is no evidence that an appeal was taken, although LBL did file a post-trial motion that was denied by Judge Carter on November 5, 2013 (Filing No. 113-1).

Wilson argues that "[s]ince the jury found against Lincoln Benefit and determined that the Subject Policies, as sold in 1999, had conversion rights, a judgment has already been reached on the merits that the Subject Policies had conversion rights" (Filing No. 101, at CM/ECF p. 27), and that, because of such finding, LBL "is barred from claiming that [Wilson's] conduct was the proximate cause for the jury's verdict in the Prior Action" (Filing No. 101, at CM/ECF p. 26). LBL responds (in a footnote) that "[t]o the extent Wilson seeks to bind the parties herein to the findings made by the jury in the Prior Action, Wilson cannot prevail because the jury found that the Policies were convertible when issued, which, in light of the Policies' written terms, could have only been based on Wilson's misrepresentations to Lollytogs" (Filing No. 119, at CM/ECF p.20). LBL further contends that "[n]either the July 13, 2000 fax, nor any subsequent representation by Lincoln Benefit that the Policies had conversion rights were an intervening cause because they ... were necessarily dependent upon Wilson's original misrepresentations regarding the conversion features at the time of sale" (Filing No. 119, at CM/ECF p. 25).

Wilson's argument presupposes that the policy language allowing conversion "[p]rior to the earlier of the policy anniversary next following the insured's seventieth birthday or the end of [a 10-year] level premium period" is ambiguous, because the insured was already 75 years old when the policies were issued, and that the jury's first finding was made for the purpose of interpreting this language. LBL's argument, on the other hand, suggests that a misrepresentation claim was submitted to the jury, based on false statements Wilson allegedly made to the Lollytogs shareholders while acting as LBL's agent.

-17-

There is evidence to support Wilson's argument. The jury was instructed that "plaintiff and defendant agree that they entered into two enforceable written contracts for term life insurance in 1999" and that it was required to decide, first of all, "whether under the term policies, plaintiff had a right of conversion when the policies were issued" (Filing No. 130-1, at CM/ECF p. 2).[11] The jury was also told that "[i]nsurance contracts should be construed according to their plain meaning and should be enforced according to their terms," but that "if you cannot determine what the policies require after you have reviewed all of the relevant evidence, then the law allows that if you find both of these competing interpretations to be reasonable, the policy provision is ambiguous and must be construed in favor of the insured plaintiff and strictly against the drafter defendant" (Filing No. 130-1, at CM/ECF pp. 2, 4).[12]

---

[11] As stated previously, the actual jury instructions are not in evidence; there is only an incomplete transcript of a conference at which the court read instructions outside the presence of the jury and the parties were permitted to make objections. The final instructions were marked as a court exhibit and delivered to the jury, but were not read in open court (*see* Filing No. 130-1).

[12] Also, the judge previously assigned to the case, the Honorable Richard M. Berman, stated in an order entered on October 13, 2011, denying in part a motion for summary judgment filed by LBL, that:

> Material questions of fact exist as to whether the Policies' conversion provisions ... applied to the Insured, who was past his seventieth birthday at the time of the execution of the Policies. These material issues pertain to the following:
>
> *(1) The meaning and intent of the language used in the Policies, i.e., whether, under the provisions, the Insured had conversion privileges up to the level premium period.*
>
> (2) What was the meaning and intent of the July 13, 2000 fax sent by a Lincoln customer service agent which stated that the Insured would "have conversion privileges up to the term(s) of the [P]olic[ies]?"
>
> * * *

-18-

Although the Lollytogs shareholders' pleadings in the New York litigation do not allege a misrepresentation claim (*see* Filing No. 104-8), and the jury does not appear to have been told that the Lollytogs shareholders were claiming to have been misled by Wilson, the jury did make a finding that LBL was estopped from denying that the term policies had conversion privileges. The jury was instructed:

> Estoppel. Plaintiff contends that defendant is obligated to provide plaintiff with conversion rights because plaintiff detrimentally relied and acted upon defendant's affirmative representations concerning the existence of conversion rights under the policies....
>
> * * *
>
> In the context of insurance, estoppel may preclude an insurer from asserting what may be an otherwise legitimate policy defense if an insurer or its agent misrepresents, even though innocently, coverage of the insurance contract to an insured, and the insured can show he reasonably relied on this information has now been prejudiced by the insurer's actions....
>
> * * *
>
> If you find plaintiff reasonably and detrimentally relied on defendant's affirmative representations concerning the existence of conversion rights under the policies through the entire 10-year-level-premium period, you must decide that defendant cannot now claim that no such conversion rights existed under the policies.

(Filing No. 103-1, at CM/ECF p. 5).

Wilson contends the jury's finding of estoppel was made solely with reference to LBL's conduct subsequent to the issuance of the policies, but the instruction set out above specifically refers to misrepresentations made by "an insurer or its agent" and

---

(Filing No. 113-2, at CM/ECF pp. 3-4) (emphasis supplied) (citations to record and legal authorities omitted).

is not limited as to time. LBL also notes that the plaintiff's attorney[13] stated during his closing argument that coverage was bound "orally" and "on a handshake," and that until receiving the written policy at a later date "[t]he insured thinks the coverage is what Jim Wilson sold him" (Filing No. 121-2, at CM/ECF p. 26).[14]

Wilson argues that he did not have any authority to modify the terms of the written policies. He notes that the term policies each provide:

> Only our officers have authority to change this contract. No agent may do this. A change must be written.

(Filing No. 106-6, at CM/ECF p. 11; Filing No. 106-7, at CM/ECF p. 11). He also notes that the special agent's agreement states he has no authority to "[w]aive or modify any terms, conditions, or limitations of any policy" (Filing No. 103-4, at CM/ECF p. 4).

Under Florida law,[15] however, "[t]he terms of an insurance policy do not preclude an action against the insurer or its agent where the agent misrepresents the

---

[13] The same attorney represents Wilson in the present litigation. Although LBL intimates that counsel's statements in the prior litigation constitute "admissions" by Wilson, this is not the case. *See, e.g.*, *Lechoslaw v. Bank of America, N.A.*, 618 F.3d 49, 57 (1st Cir. 2010) (admissions made in court filings by attorney while representing bank were not admissible against second bank which was represented by the same attorney in the litigation).

[14] Wilson states in an affidavit that although coverage was bound in October and November 1999, he did not receive the policies until January 2000, at which time he forwarded them to the Lollytogs shareholders (Filing No. 106-1, at CM/ECF p. 114, ¶¶ 10-11). In an earlier affidavit, Wilson states he received the policies on December 1, 1999 (Filing no. 106-1, at CM/ECF p. 114, ¶ 5).

[15] Judge Berman stated in his order denying LBL's motion for summary judgment that "the parties agreed at oral arguments that Florida substantive law appl[ied]" to the New York litigation (Filing No. 113-2, at CM/ECF p. 3).

coverage of the insurance contract and the insured reasonably relies on the misrepresentation to his detriment." *Gallon v. Geico General Ins. Co.*, 150 So.3d 252, 255 (Fla.App. 2 Dist. 2014) (quoting *Martin v. Principal Mut. Life Ins. Co.*, 557 So.2d 128, 129 (Fla. 3d DCA 1990). In addition, "the liability of a principal for the acts of its agent is not limited to what is expressly authorized. A principal also may be responsible for the acts of its agent if these acts lie within the apparent authority of the agent, unless the circumstances are such as to put one on inquiry." *Security Union Title Ins. Co. v. Citibank, Fla*., 715 So.2d 973, 974-75 (Fla.App. 1 Dist. 1998).

As reflected by the second finding on the verdict sheet, the jury was only asked to determine whether the July 13, 2000 fax modified the policies. The jury was instructed to decide "[w]hether the term policies were modified by *subsequent* agreement or conduct by the parties" (Filing No. 130-1, at CM/ECF p. 2) (emphasis supplied). Specifically, the instruction referred to the July 13, 2000 fax and informed the jury that "[i]f you find that Stan Shelley authorized a change to the policies and/or that Lydia Trevino [the sender of the fax] was acting on behalf of Stan Shelley with either actual authority or apparent authority, you must decide that one of defendant's officers authorized a modification of the policies and consequently that the policies at issue were modified to provide for conversion rights through the entire 10-year-level-premium period" (Filing No. 130-1, at CM/ECF p. 3).

The jury's fourth finding, that LBL relinquished any right it had to deny the plaintiff's right to convert the policies, does not appear to have been made with reference to any conduct on Wilson's part. The jury was instructed that "[p]laintiff contends that defendant is obligated to provide plaintiff with conversion rights because defendant engaged in at least three separate affirmative acts[16] in which it waived any right it might have had to deny plaintiff's conversion of the life insurance policies at issue" (Filing No. 130-1, at CM/ECF p. 5).

---

[16] The "three separate affirmative acts" of alleged waiver are not identified in the instruction.

In summary, while it is possible the jury in the New York litigation concluded that the Lollytogs shareholders were entitled to rely upon representations made by Wilson, as LBL's agent, thereby estopping LBL from denying that the policies had conversion rights, the jury seems to have construed the policy language in a manner which is entirely consistent with those representations. The jury also found that LBL subsequently modified the terms of the policies and waived any right it had to deny that the policies were convertible.

While the court is inclined to rule as a matter of law that LBL is collaterally estopped from proving its breach of contract and negligence claims, the evidence which has been presented regarding the New York litigation is incomplete. Also, considering that Wilson did not even argue collateral estoppel until filing his reply, the court is concerned that LBL has not been given a reasonable opportunity to respond.

The Federal Rules of Civil Procedure provide that "[i]f a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... give an opportunity to properly support of address the fact ...." Fed. R. Civ. P. 56(e)(1). Pursuant to this authority, or, alternatively, Federal Rule of Evidence 104,[17] the court will require Wilson to file a complete record of the New York litigation, and a supplemental briefing schedule will be established for the limited purpose of permitting the parties to address further the question of collateral estoppel. Additional relevant evidence may also be filed by Wilson and LBL.

---

[17] "The court must decide any preliminary question about whether ... evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b). "The court must conduct any hearing on a preliminary question so that the jury cannot hear it if ... justice so requires." Fed. R. Evid. 104(c)(3).

### 3. Indemnity or Contribution

LBL alleges that "[i]n the [New York] litigation, Lollytogs claimed that, after communicating the importance of conversion rights in prospective policies, Wilson made assurances and representations to Gindi and/or Sutton concerning the convertible nature of the policies" and that "[t]he assurances and misrepresentations were false, misleading, and negligent" (Filing No. 1-3, ¶¶ 50, 51). LBL claims it "is entitled to common law indemnity/contribution from Wilson for his wrongful conduct in connection with the sale and procurement of the policies" (Filing No. 1-3, ¶ 53).

Under Nebraska law "[a] party has a claim for indemnification if it pays a common liability that, as between itself and another party, is altogether the responsibility of the other party." *United General Title Insurance Company v. Malone*, 858 N.W.2d 196, 212-13 (Neb. 2015). "In contrast, a claim for contribution arises when a party has paid more than its fair share of a common liability that is allocated in some proportion between itself and another party." *Id.*, at 213.

"[T]hose entitled to indemnity are generally free from personal fault while those entitled to contribution are not." *Downey v. Western Community College Area*, 808 N.W.2d 839, 853 (Neb. 2012). "Generally, the party seeking indemnification must have been free of any wrongdoing, and its liability is vicariously imposed." *Id.*

"Contribution is defined as a sharing of the cost of an injury as opposed to a complete shifting of the cost from one to another, which is indemnification." *Malone*, 858 N.W.2d, at 212. "The prerequisites to a claim for contribution are that the party seeking contribution and the party from whom it is sought share a common liability and that the party seeking contribution has discharged more than his fair share of the common liability." *Id.* "In other words, a common liability to the same person must exist in order for there to be contribution."citing *Estate of Powell v. Montange*, 765 N.W.2d 496, 500 (Neb. 2009).

From the pleadings, it appears LBL is claiming that its liability to the Lollytogs shareholders was vicariously imposed. That is to say, LBL is asserting a claim for indemnity rather than contribution.

Wilson argues that LBL does not have a right to indemnity under the special agent's agreement, which only requires him to "indemnify LBL against any liability in connection with the payment of all ... taxes or contributions imposed or required ... with respect to compensation received under this Agreement by you" (Filing No. 103-4, at CM/ECF p. 3). LBL's indemnity claim, however, is founded on common law.[18]

Wilson also relies on the "doctrine of acquiescence" to argue that LBL "is not entitled to indemnity because it acquiesced to converting the Subject Policies through its own actions" (Filing No. 101, at CM/ECF p. 30). That doctrine has been applied "in cases when a person became liable to a third party for a dangerous condition, and as between the first person and a second party, it was the second party's duty to make the condition safe. The duty of the second party to indemnify the first was held to be waived if the first party acquiesced in the continuation of the dangerous condition." *Central Nat. Ins. Co. of Omaha v. Devonshire Coverage Corp.*, 565 F.2d 490, 495 (8th Cir. 1977) (citing Restatement (First) of Restitution § 95 (1937)). The doctrine applies only in premises liability cases and has no application here. *See id.* (doctrine of acquiescence not a defense in action where insured sued its general agent to recover damages for agent's failure to obtain reinsurance to limit insurer's risk of liability).

Finally, Wilson argues that LBL is not entitled to indemnity because its own conduct caused the injury and it waived any breach of contract. Because these arguments have already been addressed above in connection with LBL's negligence

---

[18] Although once commenting that "[i]t is questionable whether contribution and indemnity are separate causes of action, as opposed to theories of recovery," *Cerny v. Todco Barricade Co.*, 733 N.W.2d 877, 885 (Neb. 2007), the Nebraska Supreme Court has held more recently that "indemnification may be asserted as an independent claim under Nebraska law." *Malone*, 858 N.W.2d, at 217-18.

-24-

and breach of contract claims, they require no further discussion. It remains to be determined whether the doctrine of collateral estoppel applies.

### B. Wilson's Damage Claim; LBL's Declaratory Judgment Claim

Although not discussed by the parties, the special agent's agreement that was executed in 1999 provided that Wilson "shall be compensated solely by the Recruiter" and "[n]o compensation will be paid ... by LBL" (Filing No. 103-4, at CM/ECF p. 4). The recruiter on the special agent's agreement was identified as W. James & Co. (Filing No. 103-4, at CM/ECF p. 1). In 2004, however, Wilson and LBL appear to have executed an "Agent's Agreement–Appointment" which was stated to "supersede all previous agreements between the parties" (Filing No. 103-4, at CM/ECF pp. 5-6). The recruiter on this agent's agreement was identified as Freundt & Assoc. (Filing No. 103-4, at CM/ECF p. 5). Wilson claims he is owed commissions because the schedule of commissions attached to, and incorporated by reference in, the 2004 agent's agreement provides that "[i]f a Level Best Term plan is exchanged for a universal life or whole life policy within the first ten years, full first year commissions will be paid on the premium actually paid by the policy owner up to the target premium reduced by the conversion allowance, if any" (Filing No. 103-4, at CM/ECF p. 21). Wilson contends he became entitled to receive commissions after the Lollytogs shareholders notified LBL in 2007 that they intended to convert the term policies within the 10-year level premium period.

LBL denies that it owes commissions because the 2004 agent's agreement states that Wilson would be "compensated according to the Schedule of Commissions ... for premiums received on policies issued by LBL for applications secured under this Agreement" (Filing No. 103-4, at CM/ECF p. 8). LBL alleges that "Wilson is not entitled to commissions following the judgment in the underlying litigation because the term plan was not actually exchanged for universal life or whole life policies, and Lincoln Benefit did not receive premiums on converted policies" (Filing No. 1-3, ¶ 75). LBL also argues that "neither Wilson nor anyone else submitted an application

to Lincoln Benefit for the purposes of seeking to convert the Policies" (Filing No. 99, at CM/ECF p. 20). In the alternative, LBL alleges that "Wilson was not entitled to commissions following the judgment in the underlying litigation because his wrongful conduct formed the basis for the plaintiff's claims" and therefore "Wilson was in material breach of his Agent's Agreement" (Filing No. 1-3, ¶ 76).

LBL argues that securing an application and issuing a policy were conditions precedent to the payment of a commission. Wilson responds that these conditions were excused because LBL breached its duty to the insured to convert the policies.

"As a general rule, a condition is excused if the occurrence of the condition is prevented by the party whose performance is dependent upon the condition. That person must put forth a good faith effort to obtain the condition. Additionally, if a promisor prevents or hinders the occurrence of a condition precedent, the condition is excused." *Bellevue College v. Greater Omaha Realty Co.*, 348 N.W.2d 837, 840 (Neb. 1984).

"It is an elementary principle of law that when a broker produces a purchaser ready, willing, and able to enter into the subject transaction, the broker is entitled to the promised commission. An agreement to pay a commission is binding on the principal despite the refusal or default on the part of the principal to complete the transaction based on the terms agreed to." *Armstrong v. Hartford Life Ins. Co.*, 361 N.W.2d 511, 513 (Neb. 1985).

Just as in the case of LBL's damage claims, the doctrine of collateral estoppel may control the outcome of Wilson's counterclaim and LBL's claim for declaratory relief by conclusively resolving the competing issues of whether Wilson breached the special agent's agreement or LBL breached the insurance agreements. For the reasons previously discussed, the court requires additional evidence and will allow additional briefing on this matter.

IT IS ORDERED:

1.    This case is removed from the court's trial docket during the week of
      July 27, 2015, and trial is continued until further order of the court.

2.    On or before August 3, 2015, Wilson shall file a copy of the complete
      record in the case of *Stephen Carb as Trustee of Lollytogs, Inc. Trust v.
      Lincoln Benefit Life Company, Inc.*, Case No. 09cv2980, in the United
      States District Court for the Southern District of New York.

3.    Also on or before August 3, 2015, Wilson shall file a supplemental
      brief discussing whether, under the doctrine of collateral estoppel, the
      judgment and jury findings in the New York litigation preclude LBL
      from proving any essential element of its claims or require a finding in
      favor of Wilson on his counterclaim.

4.    On or before August 31, 2015, LBL shall file a responsive brief and may
      file supplemental evidence.

5.    On or before September 14, 2015, Wilson may file a reply.

6.    The parties' motions for summary judgment (Filing Nos. 97, 98) will be
      ripe for decision on and after September 15, 2015.

DATED this 7th day of July, 2015.

                                    BY THE COURT:

                                    *Richard G. Kopf*
                                    Senior United States District Judge

-27-