UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LINCOLN BENEFIT LIFE, | ) | 4:13CV3210 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| JAMES W. WILSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

In a memorandum and order entered on July 7, 2015, the court advised the parties that it was inclined to rule as a matter of law, in deciding cross-motions for summary judgment, that the plaintiff is collaterally estopped from proving its damage claims, but that ruling on the motions would be deferred pending supplementation of the record and additional briefing. *See* Filing No. 139 at CM/ECF p. 22 (citing Fed.R.Civ.P. 56(e)(1); Fed. R. Evid. 104).[1] The motions are now ripe for decision,

---

[1] The court directed the defendant to "file a copy of the complete record in the case of *Stephen Carb as Trustee of Lollytogs, Inc. Trust v. Lincoln Benefit Life Company, Inc.*, Case No. 09cv2980, in the United States District Court for the Southern District of New York," and authorized the plaintiff to file any supplemental evidence it desired (Filing No. 139 at CM/ECF p. 22). In response to a request for clarification from the defendant, the court subsequently indicated that the "complete record" of the New York litigation "should include all pleadings, trial transcripts, exhibits marked into evidence, and all trial related submissions to the court (including, but not limited to, pretrial conference orders and reports, trial briefs, motions in limine, requests to charge, and proposed jury interrogatories), plus any other court filings [the defendant] Wilson deems relevant to the issue of collateral estoppel" (Filing No. 142).

The defendant produced most of this litigation record on a compact disc (Filing No. 147), but some additional trial documents were later filed electronically (Filing No. 148). The plaintiff has also made a supplemental filing of evidence, all of which post-dates New York litigation (Filing No. 151).

without oral argument.[2] For the reasons discussed below, and in the court's previous memorandum and order, the plaintiff's motion for summary judgment will be denied and the defendant's motion for summary judgment will be granted in part and denied in part. As a result, the plaintiff's damage claims will be dismissed and the case will proceed to trial on the defendant's counterclaim for damages.

## I. Background

The plaintiff, Lincoln Benefit Life ("LBL"), is a life insurance company. The defendant, James W. Wilson, is an insurance broker. LBL sues Wilson to recover approximately $15 million in damages, claiming a right to indemnity or contribution at common law (count I), breach of contract (count II), and negligence (count III). LBL also seeks to obtain a declaratory judgment that no additional commissions are owed to Wilson (count IV). Wilson counterclaims to recover approximately $2.7 million in damages, alleging a single claim for breach of contract for nonpayment of commissions.

_____

In addition, because the plaintiff's argument references the entire course of proceedings in the prior litigation, the court on its own motion takes judicial notice of certain facts contained in other filings in the *Carb* case which are publicly available on the website maintained by the United States District Court for the Southern District of New York. *See Great Plains Trust Co. v. Union Pac. R. Co.*, 492 F.3d 986, 996 (8th Cir. 2007) (court may take judicial notice of proceedings in other courts that relate directly to matters at issue); Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Documents referencing these judicially noticed facts are cited as "SDNY Doc. No. ___ at CM/ECF p. ___."

[2] The parties' respective motions for oral argument (Filing Nos. 127, 128) will be denied because the facts and legal arguments are adequately presented in the briefs and record and oral argument would not significantly aid the decisional process.

In 1999, Wilson was retained by shareholders of Lollytogs, Inc., to procure insurance on the life of one of the company's co-founders, Samuel Gindi, in order to fund a buyout of Gindi's interest in Lollytogs upon his death. The shareholders wanted to replace an existing policy that had been issued by a company other than LBL. Wilson entered into a special agent's agreement with LBL, which then issued two term policies with 10-year level premium periods. After 10 years the premiums would escalate, but the term policies allowed for conversion to permanent insurance "[p]rior to the earlier of the policy anniversary next following the insured's seventieth birthday or the end of the level premium period" (Filing No. 103-14 at CM/ECF p. 10; Filing No. 104-1 at CM/ECF p. 10). Gindi was 75 years old when the term policies were issued.[3]

After receiving the term policies in 2000, the shareholders questioned Wilson about the policies' convertibility, and he in turn questioned LBL. A faxed response from LBL, dated July 13, 2000, stated: "This policy will have conversion privileges up to the term of the policy" (Filing No. 106-2). In 2003, Wilson again contacted LBL regarding the policies' conversion rights. This time LBL took the position that the policies were not convertible due to Gindi's advanced age, but stated that "due to the misinformation that was provided on July 13th, 2000, we will honor a conversion of both policies within 30 days" (Filing No. 106-11). LBL subsequently issued five universal life insurance policies for a "free look" period, but these policies were not accepted by the Lollytogs shareholders. LBL then reinstated the two term polices.

In 2007, the Lollytogs shareholders notified LBL that they intended to convert the two term policies before the end of their 10-year level premium periods in 2009. LBL responded that although an exception was made in 2003, "these policies are not convertible due to the insured's age" (Filing No. 106-15).

---

[3] In fact, Gindi's age was stated on pages 1 and 3 of in both policies (Filing No. 103-14 at CM/ECF pp. 3, 5; Filing No. 104-1 at CM/ECF pp. 3, 5).

In 2009, the Lollytogs shareholders filed suit for breach of contract against LBL in the United States District Court for the Southern District of New York.[4] Annual premiums were ordered paid into escrow while the case was pending. Gindi died in 2012. In 2013, after the jury returned a verdict in favor of the Lollytogs shareholders, the court entered a judgment that required LBL to pay a death benefit of $29 million (the total amount of two the term policies) and that directed the escrow agent to pay LBL approximately $7.3 million for premiums due during 2009-2012. In the words of the presiding judge, "[t]he jury handed [the Lollytogs shareholders] a resounding victory" (Filing No. 113-1, at CM/ECF p. 4).

In the present action, LBL seeks to collect from Wilson the difference between the $7.3 million premium amount that was determined by the jury and the amount it otherwise would have received as premium payments under the two term policies. Wilson meanwhile seeks to collect from LBL the amount of additional commissions he would have earned if LBL had allowed conversion of the term policies in 2009.

## I. DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the evidence is to be taken

---

[4] The New York litigation was initiated by Stephen Carb, as Trustee of Lollytogs, Inc. Trust, but the trust's successor in interest, G Investor Holdings, LLC, was later substituted as the plaintiff. For convenience, the litigation will be referred to as having been brought by the Lollytogs shareholders.

in the light most favorable to the nonmoving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, *Anderson*, 477 U.S. at 249.

## A. LBL's Damage Claims

In September 1999, LBL appointed Wilson to sell insurance products pursuant to a "Special Agent's Agreement – Appointment" (Filing No 102 (LBL's statement of material facts), ¶ 12; Filing No. 103-4). The appointment was made at Wilson's request, in connection with his shopping for life insurance for Samuel Gindi (Filing No. 102, ¶ 12; Filing No. 105 (Wilson's statement of material facts), ¶ 6).

The special agent's agreement generally provided that Wilson, while acting as an independent contractor, was to "solicit applications for the policies of insurance ... written by LBL ... and ... submit such applications received to LBL," and to "deliver policies issued by LBL, collect the first premium therefor, transmit all collections immediately to LBL, and make every effort to maintain in force all policies issued by LBL" (Filing No. 102, ¶ 14; Filing No. 103-4, at CM/ECF p. 3). Wilson had only limited authority to act on behalf of LBL, however, as the special agent's agreement specified:

> Limitation of Authority – You shall not exercise any authority on behalf of LBL other than expressly conferred by this Agreement. Specifically, but not in limitation of the foregoing, you shall have no authority on behalf of LBL to:
>
> (1)    Make, alter, or discharge any contract.
>
> * * *
>
> (4)    Waive or modify any terms, conditions, or limitations of any policy.

(Filing No. 103-4, at CM/ECF pp. 4).

The special agent's agreement provides that it "shall be governed by and construed according to the laws of the State of Nebraska" (Filing No. 103-4, at CM/ECF p. 4). The parties are in agreement that Nebraska substantive law applies in the present action.

LBL claims that Wilson breached the special agent's agreement because he "'modif[ied] terms, conditions, or limitations of [the] polic[ies]'" with "assurances and representations to Gindi and/or Sutton[5] regarding the conversion rights available" (Filing No. 1-3, ¶¶ 64, 65). Alternatively, LBL claims that Wilson "acted negligently in misrepresenting and/or failing to clarify the rights and obligations of Lincoln Benefit, Gindi, and/or Lollytogs [shareholders] both prior to and after the issuance of the policies" (Filing No. 1-3, ¶ 69).

LBL also claims it "is entitled to common law indemnity/contribution from Wilson for his wrongful conduct in connection with the sale and procurement of the policies" (Filing No. 1-3, ¶ 53). Combining elements of its claims for breach of contract and negligence, LBL alleges that "[i]n the [New York] litigation, Lollytogs claimed that, after communicating the importance of conversion rights in prospective policies, Wilson made assurances and representations to Gindi and/or Sutton concerning the convertible nature of the policies" and that "[t]he assurances and misrepresentations were false, misleading, and negligent" (Filing No. 1-3, ¶¶ 50, 51). The court construes LBL's complaint as seeking indemnity rather than contribution.[6]

_____

[5] Richard Sutton was Lollytogs' CEO.

[6] "A party has a claim for indemnification if it pays a common liability that, as between itself and another party, is altogether the responsibility of the other party." *United General Title Insurance Company v. Malone*, 858 N.W.2d 196, 212-13 (Neb. 2015). "In contrast, a claim for contribution arises when a party has paid more than its fair share of a common liability that is allocated in some proportion between itself

-6-

As an affirmative defense, Wilson alleges that LBL's claims are barred under the doctrine of collateral estoppel because it was determined in the New York litigation "that the policies had conversion rights as a result of Plaintiff Lincoln Benefit's actions (a) when the policies were sold [in 1999]; (b) when the policies were modified by Plaintiff's officers' and employees' statements in the July 13, 2000 fax; (c) under the doctrine of [promissory] estoppel; and (d) under the doctrine of waiver ...." (Filing No. 17, ¶¶ 90, 94). As discussed in the court's previous memorandum and order, the preclusive effect of the judgment that was rendered against LBL must be evaluated by applying New York law. *See Ideker v. PPG Industries, Inc., 788 F.3d 849, 852 (8th Cir. 2015)* (in a diversity case, a federal court applies state substantive law in deciding whether to apply collateral estoppel, giving a judgment preclusive effect if a court in that state would do so; this rule applies even when the original judgment is that of another federal court sitting in diversity).

In New York, "collateral estoppel, or issue preclusion, 'precludes a party from relitigating in a subsequent action or proceeding an issue raised in a prior action or proceeding and decided against that party or those in privity.'" *MLCFC 2007-9 ACR Master SPE, LLC v. Camp Waubeeka, LLC, 999 N.Y.S.2d 202, 206 (N.Y.A.D. 3 Dept. 2014)* (quoting *Weston v. Cornell Univ., 983 N.Y.S.2d 353, 355 (N.Y.A.D. 3 Dept. 2014)*). The doctrine applies when "the identical issue was necessarily decided in the prior action and is determinative in the present action." *JBGR, LLC v. Chicago Title Ins. Co., 11 N.Y.S.3d 83, 85 (N.Y.A.D. 2 Dept. 2015)*. "The determination of an issue of law or fact will not be given preclusive effect unless 'the issue [was] material to the first action or proceeding and essential to the decision rendered therein.'" *Gadani v. DeBrino Caulking Associates, Inc., 926 N.Y.S.2d 724, 727 (N.Y.A.D. 3 Dept. 2011)* (quoting *Ryan v. New York Tel. Co., 467 N.E.2d 487, 490 (N.Y. 1984)*). "Whether collateral estoppel applies presents a question of law turning on both an identity of

and another party." *Id., at 213*. "[T]hose entitled to indemnity are generally free from personal fault while those entitled to contribution are not." *Downey v. Western Community College Area, 808 N.W.2d 839, 853 (Neb. 2012)*.

issue and a full and fair opportunity to litigate that issue in the prior proceeding." *Hoopes v. Bruno*, 513 N.Y.S.2d 301, 302 (N.Y.A.D. 3 Dept. 1987); *Claim of Guimarales*, 503 N.E.2d 113, 115 (N.Y. 1986). "The party asserting collateral estoppel has the burden of establishing 'identity of the issue, while the opponent must demonstrate the absence of a full and fair opportunity to litigate.'" *Gadani*, 926 N.Y.S.2d at 727 (quoting *Jeffreys v. Griffin*, 801 N.E.2d 404 (N.Y. 2003)).[7]

The evidence shows that the Lollytogs shareholders alleged in their action against LBL that "[p]ursuant to the terms of the [two term life insurance] policies, upon reaching the age of seventy or the end of the level premium period whichever is earlier,[8] the owner of the policy is permitted to convert the subject policies from a Term Life Policy into a Flexible Premium Adjustable Life Plan or a Whole Life Plan then sold by [LBL]"; that "[n]otwithstanding the language contained in the subject policies, these policies were tendered to Gindi when he was seventy-five years old, effectively making it a contractual impossibility for him to exercise these conversion rights at the age of seventy as set forth under the terms of the contracts"; that "[LBL] was fully aware of Gindi's age at the time when the subject policies were negotiated,

_____

[7] LBL does not contend there was not a full and fair opportunity to litigate any of the issues identified by Wilson.

[8] Contrary to the Lollytogs shareholders' allegation, the term policies were not convertible "upon [the insured] reaching the age of seventy." Rather, the policies needed to be converted "[p]rior to ... the first policy anniversary next following the insured's seventieth birthday ..." (Filing No. 103-14 at CM/ECF p. 10; Filing No. 104-1 at CM/ECF p. 10). "Policy anniversary" is defined as "[t]he anniversary of the issue date in subsequent years" (Filing No. 103-14 at CM/ECF p. 7; Filing No. 104-1 at CM/ECF p. 7). "Issue date" is "[t]he date the policy is issued, as shown on Page 3" of the policy (Filing No. 103-14 at CM/ECF p. 7; Filing No. 104-1 at CM/ECF p. 7). Arguably, even though Gindi was over 70 years old when the policies were issued, he had one year from the policies' issue dates (*i.e.*, until October 1 and November 8, 2000) to exercise the right of conversion. However, neither party argued for this construction of the conversion language. The Lollytogs shareholders claimed there was a 10-year period for conversion, while LBL claimed there was none.

agreed to and issued"; that "[n]otwithstanding the fact that Gindi was over seventy years of age at the time when the policies were issued, on or about July 13, 2000, [LBL] sent a written communication ... confirming the right of conversion during the level premium period"; that "[o]n or about February 26, 2003, [LBL] acknowledged these representations in a written communication but sought to change the terms and conditions contained in the policies by only honoring the right of conversion if exercised within the next thirty days from the date of the letter"; and that the Lollytogs shareholders "refused to accept any such modification of the conversion rights set forth within the subject policies ..." (Filing No. 107-2 (amended complaint filed in *Stephen Carb as Trustee of Lollytogs, Inc. Trust v. Lincoln Benefit Life Company, Inc.*, Case No. 09cv2980, in the United States District Court for the Southern District of New York), ¶¶ 38, 41-45). As to each of the term life insurance policies, the shareholders asserted claims for (1) a declaratory judgment requiring LBL to allow conversion of the policy effective as of 2009, (2) breach of contract based on LBL's failure to convert the policy in 2009, and (3) reformation of the policy to provide a right of conversion (Filing No. 107-2). The reformation claims were dismissed at the outset of the litigation (SDNY Doc. No. 20), and the declaratory judgment claims were ordered dismissed prior to trial as being subsumed within the breach of contract claims (Filing No. 113-2, at CM/ECF pp. 3-5).

LBL states in its most recent brief that "[n]o party in the previous or the present action ever contended that the language of the policies is ambiguous" (Filing No. 149 at CM/ECF p. 19), but this is not true. The Lollytogs shareholders repeatedly claimed that the policies' conversion language was ambiguous.

For example, soon after the New York litigation was filed, LBL moved for its dismissal, arguing, as it does now, that "by the express terms of the Policies, Plaintiff never had any right of conversion" (SDNY Doc. No. 12 at CM/ECF p. 7). The Lollytogs shareholders vigorously disagreed, and argued that "[t]he Policies at Issue are Subject to more than one Interpretation" (SDNY Doc. No. 14 at CM/ECF p. 19). They stated in their opposing brief:

Defendant erroneously contends in its motion papers that the Policies contain "clear and unequivocal provisions." However, these express terms, as applied herein, would result in an absurdity. The Policies confer a right to convert each policy under a heading and subheading and then underneath these headings, impose an age condition that occurred long before the contracts ever existed, thereby creating a right that is a contractual impossibility. Therefore, because the first event (i.e. Gindi's 70th birthday) expired long before the subject policies were issued, the only way to interpret the Policies in a way that renders these provisions meaningful is to utilize the second event (the end of the level premium period i.e. 2009) as the end date for the purpose of converting the Policies.

Moreover, if the policy language is found to be ambiguous as applied, extrinsic evidence is then used to determine the parties' actual intent. If the extrinsic evidence fails to resolve the ambiguity, the policy provision in question is to be resolved in favor of the insured. See Handelsman v. Sea Ins. Co., 85 N.Y.2d 96, 101, 623 N.Y.S.2d 750, 752 (1994). As discussed herein, Lincoln and/or its agents, by their own admissions provide insight and clarification as to the intent of the parties.... Accordingly, due to the illusory nature of the age condition when read in conjunction with the remainder of the provisions contained in the Policies, Plaintiff has sufficiently pled its claim for its breach of contract and is thus entitled to proceed under this theory.

(SDNY Doc. No. 14 at CM/ECF pp. 20-21).

The New York federal district court denied LBL's motion to dismiss the Lollytogs shareholders' claims for breach of contract and declaratory judgment, but it granted the motion to dismiss the reformation claim because there was no allegation of either mutual mistake or fraud. Significantly, the court found that the Lollytogs shareholders were instead claiming that the contract was ambiguous. The court stated:

"Under New York law, reformation can be granted only in two circumstances: where there has been a [i] mutual mistake; or [ii] unilateral mistake coupled with fraudulent concealment by the knowing party." Widmar Co., Inc. v. Teachers Ins. & Annuity Ass'n of Am., 870 F. Supp. 524, 535 (S.D.N.Y. 1994) (citing Chimart Assocs. v. Paul, 489 N.E.2d 231, 234 (N.Y. 1986)); see also Brandwein v. Provident Mut. Life Ins. Co. of Phila., 3 N.Y.2d 491, 496 (N.Y. 1957)....

Plaintiff's allegations that both parties knew Mr. Gindi's correct age when the Policies were entered into, even though the Policies "permit[] conversion upon reaching the age of seventy or the end of the level premium period, whichever is earlier," (Am. Compl. ¶¶ 66-68, 72-74), do not establish mutual mistake. Rather, they point to a "question of ambiguity . . . [on] the face of the agreement" that this Court would have to resolve "[t]o order reformation[.]" Collins v. Harrison-Bode, 303 F.3d 429,435 (2d Cir. 2002) (applying New York law). Because "in the present case . . . it is impossible to determine what the parties actually agreed upon absent [findings of fact,] it is therefore impossible to reform the contract" until the breach of contract claim is adjudicated, Global Switching Inc. v. Kasver, No. 06 Civ. 412, 2006 WL 1800001, at *14 n.11 (E.D.N.Y. June 28,2006) (citing Koam Produce, Inc. v. DiMare Homestead, Inc., 213 F. Supp. 2d 314,326 (S.D.N.Y. 2002) (applying New York law)), and the appropriate "contractual 'remedy' is not 'reformation' ... but merely an action to enforce the contract." Lieberman v. Emimant Mortnaae Co., 436 F. Supp. 2d 357,365 (D. Conn. 2006). "Plaintiff[ ] also fail[s] to state a claim for unilateral mistake, as the complaint does not allege fraud[.]" Greater N.Y. Mut. Ins. Co. v. U.S. Underwriters Ins. Co., 827 N.Y.S.2d 147, 149 (1st Dep't 2007); (see also Def. Mem. at 7.)

(SDNY Doc. No. 20 at CM/ECF pp. 10-11).

When LBL later moved for summary judgment, it again argued that "[t]he express language of the Policies demonstrates that the conversion privilege was not applicable to Gindi" because he "was seventy-five years old when the Policies were issued and accepted by Plaintiff" (SDNY Doc. No. 51 at CM/ECF p. 11), and the

Lollytogs shareholders again responded that although "[u]pon reviewing the Subject Policies when received [in January 2000], uncertainty ensued as to the policies' conversion right in view of the fact that Gindi was already well over 70 years old," they "initially, and logically, believed that the conversion right was governed solely by the second triggering event – i.e., the date on which the level premium ended in 2009" (SDNY Doc. No. 59 at CM/ECF p. 11). The shareholders then "immediately contacted Wilson to request clarification and/or confirmation with respect to [their] conversion rights under the Subject Policies," and "[i]n turn, Wilson promptly contacted Lincoln Benefit directly in January 2000 to seek the specific clarification as requested by Lollytogs" (SDNY Doc. No. 59 at CM/ECF pp. 11-12 (footnote omitted)).

In denying LBL's motion for summary judgment on the Lollytogs shareholders' breach of contract claims, the court specifically found that "[m]aterial questions of fact exist[ed] as to whether the Policies' conversion provisions ... applied to the Insured, who was past his seventieth birthday at the time of the execution of the Policies" (Filing No. 113-2 at CM/ECF p. 3). More specifically, the court found there was a genuine dispute regarding, among other things:

> The meaning and intent of the language used in the Policies, see Victoria Select Ins. Co. v. Vrchota Corp., -- F. Supp. 2d --, 2011 WL 1331276 (S.D. Fla. 2011), i.e., whether, under the provisions, the Insured had conversion privileges up to the level premium period. (Def. 56.1 ¶¶ 27, 34; Pl. 56.1 ¶¶ 27, 34); Certain Interested Underwriters at Lloyd's London Subscribing to Cert. of Ins. No. 9214 v. Halikoytakis, No. 09 Civ. 1081, 2011 WL 1296816, at *5 (M.D. Fla. Mar. 31, 2011) ("An insurance policy is ambiguous when its terms are subject to different reasonable interpretations."); see also Arriaga v. Fl. Pac. Farms, L.L.C., 305 F.3d 1228, 1248 (11th Cir. 2002); Universal Underwriters Ins. Co. v. Steve Hull Chevrolet, Inc., 513 So.2d 218, 219 (Fla. Dist. Ct. App. 1987) (the "terms of the insurance contract . . . are disputed and reasonably susceptible to more than one construction, [creating] a genuine issue of material fact regarding the parties' intent").

(Filing No. 113-2 at CM/ECF p. 4).[9] The court granted LBL's motion for summary judgment with respect to the Lollytogs shareholders' declaratory judgment claim, however, "[b]ecause the issue of Defendant's alleged breach, and the parties' obligations to each other, [would] be resolved in the context of the breach of contract claims ...." (Filing No. 113-2 at CM/ECF p. 5).

LBL misrepresents the facts of the New York litigation by claiming that "both Lincoln Benefit and Lollytogs agreed that the subject insurance policies by their terms did not permit conversion because the insured was over the age of 70 at the time of issuance," and that "Lollytogs never argued that the policies by their written terms provided conversion rights" (Filing No. 149 at CM/ECF pp. 3, 7). As demonstrated above, the Lollytogs shareholders alleged and consistently argued that while it was "a contractual impossibility for [Gindi] to exercise these conversion rights at the age of seventy" (Filing No. 107-2 at CM/ECF p. 7), this meant that he had 10 years under the language of the policies to convert to whole life insurance.

This theory of the case is also clearly articulated in the final pretrial conference order, in which the Lollytogs shareholders describe their claims as follows:

> Pursuant to the terms of both of the Policies which were delivered to the insured in January 2000, under the heading "Conversion Right", both policies outline the conditions by which the conversion of the policies could be exercised. Specifically, the Policies provided that the Subject Policies could be converted at any time prior to the insured turning age 70 or prior to the expiration of the ten year level term premium period – whichever came first. Upon examination of the Policies, Plaintiff was unclear as to the "Right of Conversion" given Gindi's age and initially believed that the only logical interpretation of the provision was to rely upon the second triggering event (the end of the level premium period i.e. 2009) as the end date for the purpose of

---

[9] "[T]he parties agreed at oral arguments [on LBL's motion for summary judgment] that Florida substantive law appl[ied]" (Filing No. 113-2 at CM/ECF p. 3).

-13-

converting the Policies. Any interpretation to the contrary would have rendered the conversion provisions of the policies to provide an illusory benefit.

However, Lollytogs rather than relying on its own interpretation as it related to the "Right of Conversion" conditions, after receiving the Policies in January of 2000, Lollytogs, exercising due diligence, immediately contacted Wilson and requested a clarification and confirmation with respect to its conversion rights under the Policies. The existence of conversion rights was confirmed in multiple written communications from Lincoln.

\* \* \*

(a) <u>Plaintiff's Claims to be Tried</u>

1. <u>Breach of Contract With Regard to Conversion Rights</u>

At all times, Lincoln knew Lollytogs was seeking to purchase life insurance policies with conversion rights and Lincoln intended to issue to Lollytogs policies with conversion rights. Moreover, at all times Lollytogs believed that the Subject Policies were sold with conversion rights. Further, Lollytogs would not have purchased the Lincoln Benefit policies had they not offered conversion rights. Upon receiving the life insurance policies in question, Lollytogs sought to confirm the existence of conversion rights thereunder by contacting Lincoln's customer service department as specifically set forth in the policies. Lincoln responded to Lollytogs' pointed inquiries and affirmatively confirmed, by way of the July 13, 2000 letter to Lollytogs, that the policies sold to Lollytogs had conversion rights. It is Plaintiff's position that the inclusion of a ten year conversion right had always been the intent of the parties and that Lincoln's failure to allow the parties to convert constitutes a breach of contract.

2. <u>Modification</u>

To the extent there is a question as to whether Lincoln intended to initially issue said policies with conversion rights, Stan Shelley, an

officer of Lincoln, at the very least modified the policies sold by Lincoln so as to abolish the age-related triggering event, an event which had passed years before the policies were even issued, and provided for conversion rights of each policy through the entire ten-year level premium period, as memorialized in the written July 13, 2000 facsimile transmitted by Lydia Trevino who was acting on behalf of Stan Shelley and Lincoln with either actual or apparent authority. Florida law provides that an insurer may dispense with the statutory requirement that any such modifications must be signed. See Fla. Stat. § 627.460 see also, Fla. Stat. § 627.452. The policies expressly allow for modification and, rather than requiring a signature, by Lincoln's own choosing, the policies do not require that any written modification be signed by the officer effectuating the change. However, to the extent the Subject Policies' modification provision is considered ambiguous, such provision must be construed in favor of Lollytogs, as the insured, and strictly against the drafter, Lincoln Benefit.

### 3. Waiver

Additionally, as a matter of equity, Lincoln Benefit should be found to have waived its right to rely on the age-triggering event and from claiming that the Subject Policies are ineligible for conversion because, assuming arguendo that Lincoln had the right to deny conversion rights, it knowingly and voluntarily relinquished any such right by at least three separate, affirmative acts: (1) the July 13, 2000 facsimile; (2) the December 16, 2002 e-mail wherein Lincoln represented that conversion rights did in fact exist through the ten-year level premium period until 2009; and (3) the August 14, 2007 Conversion Illustrations.

### 4. Estoppel

As a matter of equity, Lincoln Benefit should be estopped from now relying on the age-triggering event and claiming that the Subject Policies are ineligible for conversion because Lollytogs reasonably and detrimentally relied on Lincoln Benefit's conduct and its July 13, 2000 facsimile as well as the December 16, 2002 e-mail wherein Lincoln

Benefit represented to Lollytogs that conversion rights did in fact exist through the ten-year level premium period until 2009....

5. <u>Breach of Contract with Regard to the Death Benefit</u>

The Subject Policies provided $29,000,000.00 of insurance on the life of Gindi. Lincoln breached the Subject Policies when, upon the death of Gindi, and upon the subsequent submission of a claim for the death benefit, in accord with the Subject Policies' provisions, it refused to pay any portion of the death benefit.

(Filing No. 147 (CD); SDNY Doc. No. 141 at CM/ECF pp. 5-6, 9-11 (footnote omitted)). At the pretrial conference itself, the Lollytogs shareholders' attorney also advised the court that they were claiming the conversion clauses are ambiguous (SDNY Doc. No. 146 at CM/ECF p. 22).

The jury was instructed in a manner consistent with the Lollytogs shareholders' theory of the case. The instructions read, in pertinent part:

Breach of Contractual Rights

To establish a claim of breach of contract, Plaintiff must show: (1) the existence of a contract; (2) Plaintiff's performance of the contract or a legal excuse for its nonperformance; (3) a breach of the contract by Defendant; and (4) monetary damages resulting to Plaintiff from the breach. Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. 2d DCA 2006). All of these elements must be proven by Plaintiff by a preponderance of the evidence. If you find that Plaintiff did not prove the existence of a contract by a preponderance of the evidence, you must find for Defendant.

A contract is an agreement establishing the parties' rights and duties. In this action, Plaintiff and Defendant agree that they entered into two enforceable written contracts for term life insurance in 1999. The parties have been referring to these contracts as the Term Policies. You must decide: 1) whether, under the Term Policies, Plaintiff had a right of conversion when the Term Policies were issued; 2) whether the Term

Policies were modified, by subsequent agreement or conduct by the parties, and if they were modified, how such modification(s) changed the rights and duties of the parties, if at all. Insurance contracts should be construed according to their plain meaning and should be enforced according to their terms. Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co., 913 So.2d 528 (Fla. 2005); Fla. Stat. §627.419.

When either party to a contract does not satisfy his or her duties under the contract, a breach occurs. In this action, Plaintiff asserts four breach of contract claims against Defendant.

Plaintiff's First and Second claims are identical except that the first refers to the $3 Million Term Policy and the second refers to the $26 Million Term Policy. These claims assert that Defendant breached the Term Policies by failing to convert the subject Term Policies into Universal Life Policies and seek a "declaration" allowing Plaintiff to convert the policies to Universal Life Policies provided that Plaintiff tenders the applicable premiums. First, you must determine whether a contract existed, whether it was modified and how, and what the governing terms are, including whether any conversion rights existed. Then, you must determine whether Defendant breached the contract. To determine whether a breach occurred, you must first determine whether Plaintiff was entitled to convert the Term Policies.

Plaintiff's Third and Fourth Claims are also identical except that the Third Claim refers to the $3 Million Term Policy and the Fourth Claim refers to the $26 Million Term Policy. These claims assert that Defendant breached the Term Policies by denying Plaintiff the death benefits and seek damages in the amount of the respective death benefits due under the Term Policies. You must determine whether Defendant breached the contracts (the Term Policies). Here, Plaintiff seeks monetary damages on its Third and Fourth Claims in the total amount of $29 Million, which represents the death benefits under the Term Policies.

If you find that Plaintiff did not perform its obligations under the subject Term Policies, then you must find for Defendant. If you find that Plaintiff did not prove a breach of the Term Policies by Defendant by a preponderance of the evidence, you must find for Defendant. Should

Plaintiff prevail on its breach of contract claims, it is only entitled to recover monetary damages that will restore it to the same position it would have been in if Defendant had not breached the contract. Capitol Environmental Services, Inc. v. Earth Tech, Inc., 25 So.3d 593 (Fla. ld DCA 2009). If you find that Plaintiff did not prove by a preponderance of the evidence, that it suffered quantifiable monetary damages as a result of the alleged breach, you must find for Defendant.

<u>Modification</u>

Insurance contracts are construed in accordance with the plain language of the policy to reflect the intentions of the contracting parties. Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co., 913 So.2d 528 (Fla.2005); Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161 (Fla.2003). Both parties concede that the policies allow for modification. The pertinent policy provision reads as follows: "Only our officers have authority to change this contract. No agent may do this. Any change must be written." Plaintiff contends that, by Defendant's own choosing, the policies do not expressly require that any such writing be signed by the officer effectuating the change. Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co., 913 So.2d 528 (Fla.2005); Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161 (Fla.2003); Fla. Stat. §627.452; Fla. Stat. §627.460.

If you determine that the policies as sold did not provide for conversion rights, then Plaintiff contends that Stan Shelley, an officer of Defendant, modified the policies Defendant sold so as to provide for conversion rights of each policy through the entire ten-year level premium period, as memorialized in the July 13, 2000 facsimile transmitted by Lydia Trevino on behalf of Shelley and Defendant. Plaintiff contends that Stan Shelley, Defendant's Vice President of Customer Service, authorized a change to the policies and that such change was memorialized in the July 13, 2000 facsimile. Plaintiff further contends that, in transmitting the July 13, 2000 facsimile, Lydia Trevino was acting on behalf of Stan Shelley with either actual authority or apparent authority and, consequently, any and all representations made by Trevino must be imputed to Shelley and ultimately Lincoln Benefit. Actual authority is authority that is actually granted, whether expressly

or impliedly. Restatement (Second) of Agency §7. A finding of actual authority requires evidence that the principal acknowledged that the agent will act for him, that the agent accepted responsibility of representing the principal in connection with the undertaking and that the principal retained the right to control the agent's actions. Villazon v. Prudential Health Care Plan, Inc., 843 So.2d 842 (Fla.2003); Restatement (Second) of Agency § 1. Apparent authority is authority that, though not actually granted, the principal knowingly permits the agent to exercise or which the principal has apparently delegated to the agent. Restatement (Second) of Agency §8; Borg-Warner Leasing Div. of Borg-Warner Acceptance Corp. v. Doyle Elec. Co., 733 F.2d 833 (11th Cir. 1984) (applying Florida law).

If you find that Stan Shelley authorized a change to the policies and/or that Lydia Trevino was acting on behalf of Stan Shelley with either actual authority or apparent authority, you must decide that one of Defendant's officers authorized a modification of the policies and, consequently, that the policies at issue were modified to provide for conversion rights through the entire ten-year level premium period.

Defendant claims that the Term Policies were not and could not be modified by Lydia Trevino because the clear terms of those Term Policies permit modification only in writing from an officer of Defendant, and Lydia Trevino was not an officer. Defendant contends that the 2000 Trevino fax was a misstatement about the Term Policy, not a modification.

Defendant contends that even if the July 2000 Trevino fax modified the conversion language contained in the Term Policies, Plaintiff subsequently accepted and acted upon a subsequent offer to modify the Term Policies--Defendant's one time, limited offer to permit Plaintiff to convert the Term Policies from term to whole or universal life policies as set forth in the February 26, 2003 letter from Stan Shelley and Vicki Hansen of Defendant. Defendant argues that Plaintiff accepted Defendant's 2003 offer by proceeding to convert the Term Policies to five (5) separate universal life policies in August 2003, and thereafter, asking Defendant to rescind the new universal life policies and put the original Term Policies back in force. Thus, Defendant contends that even

if the 2000 Trevino fax modified the Term Policies, the February 26, 2003 letter further modified the Term Policies. As a result, Defendant argues that its later assertion that Plaintiff did not have a right to convert the Term Policies was not a breach of the Policies.

Finally, if you cannot determine what the policies require after you have reviewed all of the relevant evidence, then the law allows that if you find both of these competing interpretations to be reasonable, the policy provision is considered ambiguous and must be construed in favor of the insured, Plaintiff, and strictly against the drafter, Defendant. Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co., 913 So.2d 528 (Fla.2005); Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161 (Fla.2003).

(Filing No. 148-1 at CM/ECF pp. 9-12).

In returning its verdict, the jury made seven specific "Findings Regarding the Term Policies," the first two of which conclusively defeat LBL's claims that Wilson is responsible for the judgment that was entered against it:

1. Did Plaintiff prove by a preponderance of the evidence that the Plaintiff had the right to convert the Term Policies to whole or universal life policies at the time the Term Policies were sold in 1999?

   YES ___✓___     NO _____

2. Did Plaintiff prove by a preponderance of the evidence that the July 13, 2000 Fax modified the subject Term Policies and gave Plaintiff the right to convert the Term Policies to whole or universal life insurance policies through the end of the level premium periods?

   YES ___✓___     NO _____

3.    Based upon the law of estoppel as I have charged you, is Defendant estopped from denying that these policies have conversion rights based upon its conduct?

      YES ___✓___        NO _____

4.    Based upon the law of waiver as I have charged you, did Defendant relinquish any right it had to deny Plaintiff the right to convert the policies?

      YES ___✓___        NO _____

5.    Did Defendant prove by a preponderance of the evidence that Plaintiff accepted Defendant's one time, limited offer to convert the subject Term Policies to whole or universal life policies by the February 26, 2003 letter?

      YES _____        NO ___✓___

6.    Write in the amount due to Lincoln in unpaid premiums:

      $___7,309,370___

7.    Did Plaintiff prove by a preponderance of the evidence that Defendant breached the contract by failing to pay the Death Benefit ($29 million)?

      YES ___✓___        NO _____

(Filing No. 108-4). While the jury's finding that the policies were modified by the July 13, 2000 fax might appear inconsistent with its previous finding that the policies as sold in 1999 provided conversion rights, the Lollytogs shareholders' attorney argued to the jury that "question number 1, number 2, number 3 and number 4 should be answered yes, that there were conversion rights, and that that's what the evidence supports" (Filing No. 147 (CD); SDNY Doc. No. 170 at CM/ECF p. 106).

On April 22, 2013, United States District Judge Andrew L. Carter entered a "Final Order After Trial By Jury," stating that the jury had returned a verdict as follows:

1.  THE JURY FOUND, that Plaintiff G INVESTORS HOLDING LLC ("G Investors") had a right to convert the Term Policies to whole or universal life policies at the time the Term Policies were sold in 1999;

2.  THE JURY FURTHER FOUND, that the July 13, 2000 Fax modified the subject Term Policies and gave G Investors the right to convert the Term Policies to whole or universal life insurance policies through the end of the level premium periods;

3.  THE JURY FURTHER FOUND, that Defendant LINCOLN BENEFIT LIFE COMPANY, INC. ("Lincoln") is estopped from denying that these policies have conversion rights based upon its conduct;

4.  THE JURY FURTHER FOUND, that Lincoln relinquished any right it had to deny Plaintiff the right to convert the policies;

5.  THE JURY FURTHER FOUND, that G Investors did not accept Lincoln's one time, limited offer to convert the subject Term Policies to whole or universal life policies by the February 26, 2003 letter;

6.  THE JURY FURTHER FOUND, that Lincoln breached its contract with G Investors to pay the Death Benefit[.]

(Filing No. 113-6). Judge Carter found that the $29 million death benefit was due and owing to the plaintiff, and he directed the clerk of the court to enter a judgment in favor of the plaintiff for such amount, plus interest; he also ordered that the judgment provide for the release of $7,309,370 from the escrow account for premium payments

to LBL (Filing No. 113-6). Judgment was entered on April 30, 2013 (Filing No. 108-6). No appeal was taken, although LBL did file a post-trial motion that was denied by Judge Carter on November 5, 2013 (Filing No. 113-1).

"If the jury's answer to the first question was based on an interpretation of the policy language, Lincoln Benefit agrees that collateral estoppel would bar the present claims" (Filing No. 149 at CM/ECF p. 18). LBL argues, however, that "[t]he jury's first finding was *not* an attempt to interpret the policies but resulted solely from Wilson's conduct" (Filing No. 149 at CM/ECF p. 19 (emphasis in original)). LBL claims "Lollytogs' attorneys convinced the jury that Lollytogs was entitled to rely on Wilson's representations at the time of sale" (Filing No. 149 at CM/ECF p. 19). More particularly, LBL states:

> In closing, Lollytogs argued that Lincoln Benefit was bound by those representations because they were made by him as the company's agent. *See* Tr. 1783 ("We contend that James Wilson, James Wales Wilson" was an "agent[] of the insurance company."). Importantly, there was no testimony at trial or elsewhere establishing that Lincoln Benefit actually authorized Wilson to make such a sale. Lollytogs did not need to make such a showing because it instead contended that Lincoln Benefit was bound by Wilson's statements under an agency theory. Lollytogs then reiterated that the verbal agreement between Lollytogs and Wilson involved conversion rights:
>
>> What we know is that the policy was sold on a handshake. That is what happens. That is not disputed. At that point in time there is coverage. The insured thinks the coverage is what Jim Wilson sold him which is the only thing Jim Wilson could have sold to him to persuade him to cancel the Prudential policy, that version.
>
> Tr. 1792. However, when the policy was delivered, it was different than the handshake deal:

> [W]hen the policy comes in, it gets read by Mr. Sultan. There is no 20-day deadline to pick up a mistake in the policy. What Mr. Sultan picks up is a mistake in the policy. If you recall, Mr. Wilson, who I submit you're going to find is an agent of the carrier, he testified I sold the policy with conversion rights. He is not even denying it. They haven't fired him. He is still their agent. I sold them with conversion rights.

Tr. 1794. Lollytogs, therefore, argued that if the jury believed the agreement negotiated by Wilson contained conversion rights in 1999, it should answer "yes" to the first question on the verdict sheet:

> If you find that the original agreement between the parties as negotiated by Jim Wilson and Ezra Sultan gave us conversion rights and this premium payment in 1999 in the contract that they mailed in Exhibits 8 and 9 in evidence do not accurately reflect the agreement, then we submit to you plaintiff wins, and you are going to get a jury verdict sheet at the end of the case. That is the first question.

Tr. 1799.

Ultimately, the jury answered the first question in the affirmative. Thus, it is undeniable that Lollytogs' conversion rights did not flow from the policies as written or from Lincoln Benefit's conduct, but from Wilson's promises at the time of sale.

(Filing No. 149 at CM/ECF pp. 9-11 (footnote omitted)).

If, as LBL contends, the jury's finding that the Lollytogs shareholders "had the right to convert the Term Policies to whole or universal life policies at the time the Term Conversions were sold in 1999" was based upon unauthorized representations made by Wilson, then the jury failed to follow the court's instructions regarding the law of agency, which read as follows:

## Agency

"Agency" exists where one agrees to act on behalf of another. The person or company being represented is called the "principal." The person or company doing the representing is called the "agent." A principal-agent relationship can result in two ways a) through actual agency or b) through apparent agency. See Ilgen v. Henderson Properties, Inc., 683 So. 2d 513, 515 (Fla. 2d DCA 1996).

The elements essential to establish an actual agency relationship are: (1) the principal's acknowledgement that the agent will act for him; (2) the agent's acceptance of the undertaking; and (3) control by the principal over the actions of the agent. Goldschmidt v. Holman, 571 So.2d 422, 424 n. 5 (Fla. 1990).

The elements essential to establish an apparent agency are: (1) a representation by the purported principal; (2) reliance on that representation by a third party; and (3) a change in position by the third party in reliance upon such representation. Mobil Oil Corp. v. Bransford, 648 So.2d 119, 121 (Fla. 1995). See generally Fojtasek v. NCL (Bahamas) Ltd., 613 F. Supp. 2d 1351, 1357 (S.D. Fla. 2009).

The communications given and received by such agents *within the scope of the agency relationship* are deemed to be as if such communications were given or received by the principal. *Within the scope of the agency relationship*, all of an "agent's" actions and conduct are deemed as if done by the principal.[10]

Ratification occurs when a person with full knowledge of all the material facts confirms, approves, or sanctions, by affirmative act or acquiescence, the originally unauthorized act of another. Ratification can be found to have occurred by implication when a principal fails to repudiate an agent's act as soon as it is fully informed of what the agent has done.

---

[10] LBL conveniently omits the phrase "within the agency relationship" when quoting this instruction in its brief (Filing No. 149 at CM/ECF p. 19).

-25-

A principal cannot accept the benefits of an agent's unauthorized conduct and then deny liability or that the agent's conduct should be imputed to the principal based on the fact that the conduct was unauthorized.

(Filing No. 148-1 at CM/ECF p. 9 (emphasis supplied)).

Thus, the court instructed the jury that LBL could be held liable for Wilson's representations if they were either (1) "within the scope of the agency relationship" or (2) subsequently ratified. "A jury is presumed to follow its instructions." *Guyton v. Tyson Foods, Inc.*, 767 F.3d 754, 762 (8th Cir. 2014) (quoting *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

Even assuming that LBL is correct in arguing that there was no evidence to support a finding that Wilson was authorized in 1999 to sell the term policies with conversion rights,[11] the jury could still answer "yes" to the first question by finding that LBL ratified the sales with the July 13, 2000 fax, which confirmed that the Lollytogs shareholders would "have conversion privileges up to the term of the policy." The result is the same in either case:

[I]f the principal authorized the agent's acts, or otherwise acquiesced in or ratified such acts, the agent will not be held liable to the principal for the losses resulting from those acts. *See*, *McNamara v. Johnston*, 522 F.2d 1157, 1165 (7th Cir.1975) (explaining that "as between agent and principal, an agent cannot be held liable for the use of the principal's property in an unlawful manner when it is reasonable to infer that the principal authorized the agent's conduct"); *Olson v. Thompson*, 273 Minn. 152, 140 N.W.2d 321 (1966) (stating that although the actions of the agent constituted a tort, the agent is not liable

---

[11] However, it is immaterial for collateral estoppel purposes whether the jury's verdict was supported by the evidence. *See City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1869 (2013) ("[E]ven an erroneous judgment is entitled to res judicata effect.").

to the principal for damages arising from such actions because the agent was acting in accordance with the principal's instructions); *Gutting v. Jacobson,* 184 Neb. 402, 167 N.W.2d 762 (1969) (stating that an agent is liable to the principal for violations of the agent's fiduciary duties, but that a principal may by acquiescence release the agent from such liability); *Kidd v. Maldonado,* 688 P.2d 461 (Utah 1984) (finding that although the agent completed an earnest money agreement contrary to the principal-seller's instructions, the seller ratified the agent's acts when the seller read and signed the agreement); Restatement [(Second) of Agency] § 401, comment *d.* Cf., *Putnam v. DeRosa,* 963 F.2d 480 (1st Cir.1992) (holding that a principal does not have an action against his agent for indemnification based on the agent's misrepresentations because the principal was not "blameless" in the misrepresentations made to the third parties); *Warner v. Reagan Buick,* 240 Neb. 668, 483 N.W.2d 764 (1992); *City of Wood River v. Geer-Melkus Constr. Co.,* 233 Neb. 179, 444 N.W.2d 305 (1989) (discussing indemnification actions and stating that a party seeking indemnification must have been free from any wrongdoing); *Hiway 20 Terminal, Inc. v. Tri-County Agri-Supply, Inc.,* 232 Neb. 763, 443 N.W.2d 872 (1989); Restatement, *supra,* § 411, comments *c.* and *d.* (stating that if both the principal and the agent are aware that the performance of an act is wrongful, ordinarily the agent is not liable to indemnify the principal for damages arising from the performance of that act).

*Barta v. Kindschuh*, 518 N.W.2d 98, 100-01 (Neb. 1994).

Alternatively, the jury made a finding that "the July 13, 2000 Fax modified the subject Term Policies and gave [the Lollytogs shareholders] the right to convert the Term Policies to whole or universal life insurance policies through the end of the level premium periods" (Filing No. 108-4). Wilson played no part in such modification, other than to seek clarification from LBL regarding the conversion language. The jury was instructed that "[i]f you find that Stan Shelley authorized a change to the policies and/or that Lydia Trevino was acting on behalf of Stan Shelley with either actual authority or apparent authority, you must decide that one of defendant's officers authorized a modification of the policies and consequently that the policies at issue

were modified to provide for conversion rights through the entire 10-year-level-premium period" (Filing No. 148-1 at CM/ECF p. 11).

As a matter of law, the verdict returned by the jury in the New York litigation precludes LBL from claiming that Wilson is liable for any portion of the money judgment the Lollytogs shareholders obtained against it. The jury's first finding was either based upon a determination that the term policies' conversion language is ambiguous, or upon a determination that Wilson was authorized by LBL to sell the policies with conversion rights and that the policies as delivered did not reflect the terms of the sale. The jury's second finding establishes that to the extent Wilson may have acted without authority, or negligently, LBL ratified the sale of the policies with conversion rights. LBL's damage claims against Wilson therefore will be dismissed with prejudice.

### B. Wilson's Damage Claim; LBL's Declaratory Judgment Claim

Although not discussed by the parties, the special agent's agreement that was executed in 1999 provided that Wilson "shall be compensated solely by the Recruiter" and "[n]o compensation will be paid ... by LBL" (Filing No. 103-4, at CM/ECF p. 4). The recruiter on the special agent's agreement was identified as W. James & Co. (Filing No. 103-4, at CM/ECF p. 2). In 2004, however, Wilson and LBL appear to have executed an "Agent's Agreement–Appointment" which was stated to "supersede all previous agreements between the parties" (Filing No. 103-4, at CM/ECF pp. 5-6). The recruiter on this agent's agreement was identified as Freundt & Assoc. (Filing No. 103-4, at CM/ECF p. 5). Wilson claims he is owed commissions because the schedule of commissions attached to, and incorporated by reference in, the 2004 agent's agreement provides that "[i]f a  Term plan is exchanged for a universal life or whole life policy within the first ten years, full first year commissions will be paid on the premium actually paid by the policy owner up to the target premium reduced by the conversion allowance, if any" (Filing No. 103-4, at CM/ECF p. 21). Wilson contends he became entitled to receive commissions after the Lollytogs shareholders notified

LBL in 2007 that they intended to convert the term policies within the 10-year level premium period.

LBL denies that it owes commissions because the 2004 agent's agreement states that Wilson would be "compensated according to the Schedule of Commissions ... for premiums received on policies issued by LBL for applications secured under this Agreement" (Filing No. 103-4, at CM/ECF p. 8). LBL alleges that "Wilson is not entitled to commissions following the judgment in the underlying litigation because the term plan was not actually exchanged for universal life or whole life policies, and Lincoln Benefit did not receive premiums on converted policies" (Filing No. 1-3, ¶ 75). LBL also argues that "neither Wilson nor anyone else submitted an application to Lincoln Benefit for the purposes of seeking to convert the Policies" (Filing No. 99, at CM/ECF p. 20). In the alternative, LBL alleges that "Wilson was not entitled to commissions following the judgment in the underlying litigation because his wrongful conduct formed the basis for the plaintiff's claims" and therefore "Wilson was in material breach of his Agent's Agreement" (Filing No. 1-3, ¶ 76).

The collateral estoppel doctrine precludes LBL's defense that Wilson is in material breach of the agent's agreement because his "conduct formed the basis for the [Lollytogs shareholders'] claims" in the New York litigation. On the evidence presented, however, the court is unable to conclude as a matter of law that Wilson is entitled to payment of additional commissions. A trial will be required in any event because Wilson's motion does not address the amount of damages to which he claims entitlement.

## II. CONCLUSION

Wilson is not liable to LBL for the judgment that was entered in favor of the Lollytogs shareholders in the New York litigation. It remains to be determined whether LBL is liable to Wilson for commissions he would have earned had LBL not

breached its contractual obligations to the Lollytogs shareholders by refusing to convert the term life policies to whole or universal life policies.

Accordingly,

IT IS ORDERED:

1.     Plaintiff's motion for oral argument (Filing No. 127) is denied.

2.     Plaintiff's motion for summary judgment (Filing No. 97) is denied in all respects.

3.     Defendant's motion for oral argument (Filing No. 128) is denied.

4.     Defendant's motion for summary judgment (Filing No. 98) is granted in part and denied in part, as follows:

   a.     Plaintiff's damage claims (counts I, II, and III of the complaint) are dismissed with prejudice.

   b.     Plaintiff is precluded from asserting as a defense that Defendant breached the agent's contract in connection with the sale of the term life insurance policies.

   c.     In all other respects, the motion is denied.

5.     This matter is referred to Magistrate Judge Cheryl R. Zwart for further progression, as appropriate.

DATED this 16th day of December, 2015.

BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.